

FILED

Jul 01 2015, 8:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Joseph M. Johnson, II
Joseph M. Johnson, P.C.
Decatur, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Joseph M. Johnson, III,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

July 1, 2015

Court of Appeals Case No.
01A02-1501-CR-25

Appeal from the Adams Superior
Court

Case No. 01D01-1405-FD-51

The Honorable Max C. Ludy, Special
Judge.

**Friedlander, Judge.**

Joseph M. Johnson III appeals his conviction of Criminal Trespass,[1] a class A misdemeanor, presenting the following restated issues for review:

> 1. Is the criminal trespass statute unconstitutionally vague as applied in this case?
>
> 2. Did the court properly apply the "mistake of fact" defense?
>
> 3. Was the evidence sufficient to sustain the conviction?

We affirm.

The facts favorable to the conviction are that approximately five years before the events that culminated in this conviction, Johnson and Danielle Lee had an extramarital affair. The relationship ended abruptly but amicably after a few months. In early February 2014, Johnson and Lee bumped into each other and Johnson apologized to Lee for their prior relationship. Johnson had recently separated from his wife. In March of that year, Johnson began calling Lee. At first, Lee did not answer the phone. Eventually, however, when Johnson's calls came late at night, she answered and told Johnson not to contact her. Johnson persisted and Lee eventually agreed to meet him for dinner. Johnson picked

---

[1] Ind. Code Ann. § 35-43-2-2(2) (West, Westlaw current with all 2015 First Regular Sess. of the 119th General Assembly legislation effective through June 28, 2015).

her up at her apartment and the two went to dinner. For the next month or so, they communicated frequently by text and phone calls.

[4] At some point around the beginning of April, however, Lee told Johnson that she did not want to see him or have a relationship with him. Johnson responded by "calling more and texting more." *Transcript* at 12. Lee tried to ignore Johnson's attempts at communication, but eventually "it just got too persistent" and she finally answered and again told him to leave her alone and stop calling. *Id.* On April 6, Johnson called and said he wanted to come to her apartment and talk to her. Lee told him that she did not want him to come over. According to Lee, "he was crying and acting upset a lot". *Id.* at 13. Against Lee's expressed wishes, however, Johnson appeared at her apartment door at approximately 8 or 9 o'clock that evening. Lee answered the door, but would not let Johnson enter her apartment. Johnson "kept saying he wanted to talk to [Lee] and explain how he felt and wanted to explain the life he could provide for [her]". *Id.* Johnson stood in the doorway and would not let Lee shut her door. She told him to leave "[a]t least a dozen times." *Id.* at 16. She informed him that she would call the police if he did not leave. When she did so, however, "[h]e just kept crying and saying that he wanted to explain and he wanted to talk to [her]." *Id.* During the conversation, although Johnson would occasionally walk away from the door, he soon returned and stood in the threshold of the doorway such that Lee could not close it. Finally, Lee warned him that if he did not leave she would call 911. It was only when she started dialing the number that he left.

[5] Lee called police and reported what had happened. She told police that she did not want Johnson there and that he would not leave. A short time later, police arrived and spoke with Lee. She asked the police to contact Johnson, a local attorney, and ask him not to come back. They did. Even after the police spoke with him, however, Johnson repeatedly attempted to contact Lee through phone calls and texts during the next couple of days. Lee received "[a]t least fifty plus text messages" during those few days. *Id.* at 19. Lee informed police about Johnson's repeated attempts to contact her.

[6] At 4 a.m. or 5 a.m. on April 9, Lee walked her boyfriend to the door as he was leaving. When she opened the door to her apartment, she found a note in a manila envelope. Substantively, the note was "identical" to a text or texts she had received earlier from Johnson.[2] Lee called police again and an officer

---

[2] The typed, unsigned note stated:

> It's just me. If you don't want me just let me know personally. I will leave you alone. everything [sic] I have said is true and real. if [sic] what I have to offer a woman, that, being you, is not what you want then I'm fine with that. You're everything I have ever wanted and I love you. Take it or leave it. I will treat you like the queen that you are. I understand that if you are in love with that other guy and that is really what you want then go get it. I have laid down everything before you. You will either accept it or reject it. I will continue to move on with or without you. I just wanted you to know how I felt and what I can provide. If you don't want that, you are not what I thought you were and you used me. So there is. My last stab at it. Take it or leave it. I can assure you that there will be much happiness and love in the future. We can figure it all out as we go. I just have to know if your [sic] willing to at least talk to me so that you can hear it from my lips and mouth. If it is rejection then I want to hear it out of your mouth. As I write this I am spent. I have done all I can do to try to make myself happy. I just thought you might be the one that I could spend the rest of my life with. That's all I

responded and spoke with her at her apartment. As a result of that conversation, a police officer once again spoke with Johnson and asked him to stop contacting Lee.

[7] At about 3:30 p.m. that day, Lee was standing on the balcony of her third-floor apartment watching for her kids to arrive home on the school bus. She saw the school bus driving into her parking lot, followed closely by Johnson's car. Lee quickly went downstairs to meet her children and "rushed" them up and into the apartment "so that [she] could hurry up and shut the door before [Johnson] got up there." *Transcript* at 24. She saw Johnson enter her apartment building and climb to the landing on her level. He said her first name, and she took a picture of him with her cell phone and began to dial her phone. He asked who she was calling and she told him to leave. She then shut her door and called the police. Johnson left the scene.

[8] Johnson was charged under Counts I (based upon the April 6 incident) and II (based upon the April 9 incident) with criminal trespass, both as class A misdemeanors, and under Count III with making a false statement,[3] as a class

---

have to say. You know how to get ahold of me. Please let me know some how [sic]. I love you and always will.

*Exhibit Binder*, State's Exhibit 11.

[3] The allegation supporting this charge was that Johnson answered "no" to the question whether he had been adjudicated mentally defective or ever been committed to a mental institution when filling out a form for purchasing a handgun, pursuant to Ind. Code Ann. § 35-47-2.5-3 (West, Westlaw current with all 2015 First Regular Session of the 119th General Assembly legislation effective through June 28, 2015).

D felony. Count III was dismissed upon Johnson's motion prior to trial. Following a bench trial, Johnson was found guilty of Count I and not guilty of Count II.

1.

[9] Johnson concedes that the criminal trespass statute, I.C. § 35-43-2-2, is constitutional on its face, but contends that it was unconstitutional as applied in his case. There is authority for the State's argument that a challenge to the constitutionality of a criminal statute must be raised by a motion to dismiss prior to trial, and the failure to do so waives the issue on appeal. *See Donaldson v. State,* 904 N.E.2d 294 (Ind. Ct. App. 2009). Inasmuch as Johnson did not file a pretrial motion to dismiss on this basis, the State argues, the issue is waived. We note, however, that in some instances this court has considered such a challenge even where the defendant failed to file a pretrial motion to dismiss. *See, e.g.*, *Boyd v. State*, 889 N.E.2d 321 (Ind. Ct. App. 2008); *Vaughn v. State*, 782 N.E.2d 417 (Ind. Ct. App. 2003), *trans. denied*. We chose to do so here.

[10] At the outset, we summarily reject Johnson's contention that the trespass statute applies only for unwelcomed incursions onto real property, versus unwelcomed incursions onto leaseholds such as Lee's apartment in the present case. *See Walls v. State*, 993 N.E.2d 262 (Ind. Ct. App. 2013), *trans. denied.*

[11] Moving now to the second argument offered in support of Johnson's challenge to the constitutionality of this statute, he contends the statute was applied under circumstances in which he "never entered [Lee's] apartment, never crossed her

threshold or attempted to enter her apartment, and at all times remained in a common area open to the public [.]" *Corrected Appellant's Brief* at 4. Johnson continues that because Lee had no possessory interest or control over the common areas of the apartment complex, the area where he was located at the time of this incident was not "the real property of another" within the meaning of I.C. § 35-43-2-2 and Lee did not have authority to order him from it.

[12] The challenger to the validity of a statute must overcome a presumption that the statute is constitutional. *Brown v. State*, 868 N.E.2d 464 (Ind. 2007). That party bears the burden of proving otherwise. *Id.* A statute violates due process principles and is void for vagueness if it does not clearly define its prohibitions. *Id.* Johnson contends his conviction violates this principle because the statute, as applied in his case, failed to "provide the kind of notice that will enable ordinary people to clearly understand what conduct is prohibited." *Corrected Appellant's Brief* at 7. A criminal statute may be deemed unconstitutionally vague if it (1) fails to provide notice enabling ordinary people to understand the conduct that it prohibits, or (2) if there exists the possibility that it authorizes or encourages arbitrary or discriminatory enforcement. *Brown v. State*, 868 N.E.2d 464. In order to pass constitutional muster in this regard, the statutory language must convey a sufficiently definite warning with respect to the "proscribed conduct when measured by common understanding." *Id.* at 467 (quoting *Rhinehardt v. State,* 477 N.E.2d 89, 93 (Ind. 1985)). We note, however, that a statute may convey a sufficiently definite warning without listing specifically all of the items of prohibited conduct. *Brown v. State*, 868 N.E.2d 464.

[13] Johnson contends that he never committed the predicate act of entering the "real property" of Lee. He contends that under her lease, her premises included only "the portion of the apartment building located within the interior walls of the apartment." *Corrected Appellant's Brief* at 8. At most, he contends, he remained in the common areas of the apartment complex at all times, i.e., "between the front door of the apartment building and the door to her apartment." *Id.* at 10. The facts favorable to the conviction showed that Johnson traversed the area between the front door of the apartment building in which Lee's apartment was located and walked up the stairs and across the landing on her floor and stood in the threshold of the door to her apartment. Could all of these areas be fairly characterized as Lee's real property within the meaning of I.C. § 35-43-2-2(a)(1)?

[14] In *Walls v. State*, 993 N.E.2d 262, the defendant was convicted of, among other things, criminal trespass. In that case, the intoxicated defendant was in the common area of an apartment building and believed that he knew people there. It turned out, however, that he was mistaken in this belief. He lay in front of the door to one apartment and started kicking on the door with his feet. The woman inside woke up and went to the door. When she opened it, she saw the defendant sleeping in the hallway. She attempted to awaken the defendant, asked him to leave, and then shut her door. Rather than leave, the defendant knocked on the woman's door and asked to come in and spend the night. When he was refused entry, the defendant began banging on the door and yelling. The victim asked him to leave several times and finally threatened to

call the police if he did not leave. At about this time, two female roommates in a nearby apartment were awakened by the disturbance and opened their door to see what was happening. The defendant began walking toward their door, told them he was drunk, and asked if he could come in. When one of the women refused, the defendant tried to kiss her hand and grabbed her neck. He attempted to enter the apartment and placed his foot across the threshold of the apartment. The victim and her roommate finally managed to push him out of the apartment and shut the door. Police responded and eventually subdued the defendant.

[15] The defendant was convicted of, among other things, criminal trespass with respect to the incident. In challenging the conviction, the defendant argued that only the owner of the apartment complex or its agent, and not any tenant, could ask him to leave common areas of the apartment complex. Upon appeal, we addressed the question "whether [the women tenants] had a sufficient interest in their leased apartment units to support their requests for [defendant] to leave the areas immediately outside their doors." *Id.* at 267. We observed that defendant "was not merely present in the common areas" of the apartment complex. *Id.* Rather, he "also was positioned immediately outside the doors giving access to the leased apartment units, persistently banging on the doors to the units, and in [the roommates'] case, had his foot through the threshold of the door." *Id.* In rejecting the defendant's challenge, the court held:

> Under the circumstances of this case, the tenants, while not in exclusive control of the common areas, had a sufficient possessory interest in, at a minimum, their apartment doors, the threshold of their

apartments, and the immediate adjacent areas by which they accessed their leased apartment units, to request that a person leave that specific area and stop persistently banging on their doors. A rigid rule, applied without exception, that a tenant does not have a sufficient possessory interest in such property would defy logic and lead to an absurd result.

*Id.* at 267.

In the present case, Johnson was convicted of trespass in connection with the April 6 incident. After an emotional phone call, and against Lee's expressed wishes, Johnson traveled to Lee's apartment and said he wanted to talk to her. Lee answered the door, but would not let Johnson enter her apartment. While Johnson made an emotional appeal to talk to Lee about their relationship, Lee repeatedly told him to leave. In fact, she told Johnson to leave "[a]t least a dozen times", *Transcript* at 16, but he refused to do so. During the encounter, Johnson stood in the threshold of the doorway such that Lee could not shut her door. Johnson finally left only after Lee began dialing 911. Lee had a sufficient possessory interest in her apartment door, the threshold to the door, and common area immediately adjacent to her door such as to possess authority to request that Johnson leave those areas and stop harassing her. Under these circumstances, a person of ordinary intelligence would have no difficulty determining that Lee's behavior was prohibited by the I.C. § 35-43-2-2. *See Walls v. State*, 993 N.E.2d 262. Accordingly, Johnson's claim that the statute is unconstitutionally vague as applied to him fails.

### 2.

Ind. Code Ann. § 35-41-3-7 provides: "It is a defense that the person who engaged in the prohibited conduct was reasonably mistaken about a matter of

fact, if the mistake negates the culpability required for commission of the offense." (West, Westlaw current with all 2015 First Regular Session of the 119th General Assembly legislation effective through June 28, 2015). Johnson asserted that he reasonably believed he had a right to be in the area near Lee's apartment from which Lee ordered him to leave, and concomitantly that she did not have authority to order him off of that property. He contends that this belief negated the requisite mens rea element of the trespass offense, thus establishing the "mistake of fact" defense. He claims the trial court erred in concluding otherwise.

[19] In order to establish a mistake-of-fact defense, the defendant must prove the following three elements: (1) The mistake was honest and reasonable; (2) the mistake concerned a matter of fact; and (3) the mistake negated the culpability required to commit the crime. *Chavers v. State*, 991 N.E.2d 148 (Ind. Ct. App. 2013), *trans. denied.* After the State has made a prima facie case of guilt, the defendant bears the burden of establishing an evidentiary predicate of his claimed mistaken belief of fact. *Id.* Nevertheless, the State retains the ultimate burden of proving beyond a reasonable doubt every element of the charged crime, including culpability or intent. The State may meet this burden with respect to the mistake-of-fact defense in several ways, including (1) directly rebutting the defendant's evidence, (2) affirmatively showing that the defendant made no such mistake, or (3) relying upon evidence from its case-in-chief. *Id.*

[20] Upon appeal, Johnson's mistake-of-fact argument is reflected in the following:

Mr. Johnson explained in his testimony that he did not believe that he entered or was on or within the real property of Ms. Lee, at any time, and that he believed that he was in a common area which was not real property of Ms. Lee. If the fact is that Ms. Lee's "real property", as such term is used in the Trespass Statute, could constitutionally include some undefined area outside her door, Mr. Johnson was mistaken in regard to such fact. His belief was reasonable and was in good faith. How would Mr. Johnson or for that matter, how would anyone know the location of, boundary of or the scope of such an undefined "possessory area"? …

Mr. Johnson was in a common area of the apartment building where Ms. Lee's apartment was located. As such, there was nothing which would have caused him to believe that Ms. Lee had some "possessory interest" in the common area, which gave her authority to demand that Mr. Johnson leave. Believing reasonably that he was lawfully in the common area as a public invitee, he knew that he was not trespassing on Ms. Lee's real property, after she asked him to leave the area outside her door.

*Corrected Appellant's Brief* at 11-12.

[21] In order to succeed in this argument, Johnson must first establish the factual predicate upon which it is premised, i.e., that he was in a "common area" of the apartment complex at all times. Lee testified that after Johnson knocked on her door, she answered but did not let him in. She asked at least a dozen times that Johnson leave. According to Lee, Johnson did not merely stand near her door in the hallway, he stood *in* the doorway such that she could not close the door. As Lee described it, "He was right in the threshold." *Transcript* at 17. If believed, Lee's testimony reflects that Johnson did not remain in the common area of the apartment complex at all times, but rather entered into the area of Lee's leasehold when his physical location prevented Lee from closing her door and securing herself inside her apartment. Of course, Johnson's testimony and

Lee's testimony differed markedly on this point. The trial court noted as much in stating, "Mr. Johnson says basically today that that didn't happen that way because the door wasn't even opened and he never stood in the doorway and he never prevented her from closing the door." *Id.* at 77. The trial court weighed the conflicting testimonies and concluded, "If I have to decide between … Miss Lee and Mr. Johnson, it's going to be Miss Lee." *Id.* at 78.

[22] In resolving this issue, we need not determine the full extent of the physical boundaries of Lee's authority to order Johnson from common areas of the apartment complex, i.e., areas located adjacent to but outside her apartment unit. This is because, as set out above, the trial court found that Johnson went beyond the common areas of Lee's apartment building and stood in the threshold of the doorway to her apartment such that she could not close the door. *See Walls v. State*, 993 N.E.2d 262. Upon this set of facts, which is the one we must accept, Johnson's belief that he had a right to stand in the doorway to Lee's apartment such that she was prevented from closing it, and that she lacked authority to order him to leave that location was not reasonable. The trial court did not err in rejecting Johnson's mistake-of-fact defense.

3.

[23] Johnson contends the evidence was not sufficient to sustain his conviction. This issue is premised upon Johnson's claim that he did not cross Lee's threshold such that she was prevented from closing her door, and indeed that "[s]he clearly could have shut the door at any time." *Corrected Appellant's Brief* at 16. The factual predicate for this claim is clearly at odds with the trial court's

finding that Johnson stood in Lee's doorway such that she could not close it. It is of no significance that during the encounter he occasionally left the doorway and paced back and forth in the common area outside of her apartment. It is enough that Lee asked him "at least a dozen times" to leave and that there were times that he stood in the doorway such that Lee was prevented from shutting her door. *Transcript* at 16.

[24] When reviewing a challenge to the sufficiency of the evidence, we consider only the evidence supporting the judgment, together with any reasonable inferences that can be drawn from such evidence, and we may not reweigh evidence nor judge witness credibility. *Thang v. State*, 10 N.E.3d 1256 (Ind. 2014). In order to reverse Johnson's conviction on these grounds, we would be required to ignore these constraints upon our review. We cannot and will not do this. Considering the evidence favorable to the conviction and in deference to the trial court's assessment of the credibility of Lee's and Johnson's testimonies, we conclude that the evidence was sufficient to support the conviction.

[25] We affirm.

Baker, J., and Najam, J., concur.